# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 95-DP-00407-SCT

*SHERWOOD BROWN A/K/A SHERWOOD DYWANE BROWN*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/07/95 |
| TRIAL JUDGE: | HON. ANDREW CLEVELAND BAKER |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | SUSAN M. BREWER |
| | JACK R. JONES III |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LESLIE S. LEE |
| | MARVIN L. WHITE JR. |
| DISTRICT ATTORNEY: | NA |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY (DIRECT APPEAL) |
| DISPOSITION: | AFFIRMED - 12/12/96 |
| MOTION FOR REHEARING FILED: | 12/20/96 |
| MANDATE ISSUED: | 3/20/97 |

**EN BANC.**

**McRAE, JUSTICE, FOR THE COURT:**

¶1. Sherwood Dywane Brown was convicted and sentenced to death by a jury of the Lafayette County Circuit Court, sitting in DeSoto County, on one count of capital murder for the death of thirteen year old Evangela Boyd while committing felonious abuse and/or battery of a child. He further was found guilty and sentenced to serve two consecutive sentences of life imprisonment for the murders of Verline and Betty Boyd, the child's mother and grandmother. Finding no merit to his assignments of error raised in this appeal, we affirm the decision of the court below.

## FACTS

¶2. Early Thursday morning, January 7, 1993, five year old Yoichi Boyd went down the road to her grandmother's house to wait for the school bus. Upon entering the house, she discovered the bodies of her aunt and grandmother, Verline and Betty Boyd. When the school bus arrived, she told the bus driver what she had found. The bus driver went back to the house with the child and saw the body of

Verline Boyd in the doorway.

¶3. The DeSoto County Sheriff's Department received a dispatch at 7:50 a.m. that morning advising them of a murder on Boyd Road in the Eudora Community. Captain Janet Taylor and Lieutenant Tim Roberts arrived at the scene at 8:08 a.m. The front door was open when they arrived, and the house was "totally ransacked." Verline Boyd was lying on the floor in the doorway leading from the porch to the dining room. Upon discovering Betty Boyd's body in the living room, Taylor determined that additional assistance was needed and radioed for backup support. Sheriff James Riley and Captain Johnie Combes soon arrived and they completed their search of the house. It was then that they found the nude body of Evangela Boyd in the laundry room.

¶4. Eighty-two year old Betty Boyd died from "multiple chop wounds to the head." Dr. Steven Hayne, the forensic pathologist who performed postmortem examinations on all three victims, testified that the largest of these extended "from the forehead to the chin coursing through the nose and mouth area" and measured nineteen centimeters or approximately seven and one half to eight inches long, and was roughly four inches deep. She also suffered a horizontally-oriented chop wound to the back of the skull, measuring some eight centimeters or nearly four inches wide. Dr. Hayne described some twelve "traumatic findings" or chop wounds to her face, skull and brain, as well as bruises to her head, eyes, chin and hand, and a fractured jaw. He opined that a considerable amount of force was required to produce the injuries she sustained.

¶5. Verline Boyd, who was found face-down by the front door, died from multiple chop wounds to the forehead and right posterior aspect of her head, which caused lacerations to her brain. The largest of the head wounds was some five and one half inches long. She suffered injuries to her hands which Dr. Hayne described as "supportive of the concept of a defensive posturing injury; that is, a person who is trying to ward off a blow, in this case a chop wound, by raising one's hand, forearm as well as digits, either right or left or both, usually trying to protect the face as well as the neck and the upper part of the chest."

¶6. Thirteen year old Evangela Boyd, like her mother and grandmother, died from multiple chop wounds to her head. The primary wound, to the back of her head, was approximately seven inches long. In addition to the fatal head injuries, Dr. Hayne identified chop wounds as long as four inches on her left shoulder; chop and stab wounds as well as large scrapes on her back; scrapes and abrasions on the right hip; multiple abrasions and lacerations near the right knee; multiple chop wounds to the right forearm and fracture in the ulna and radius of that arm; chop wounds on her right hand, one of which nearly severed her thumb; and lacerations to the fingers on her right had which had nearly cut the fingers in two. Although the girl's nude body was discovered with her bra pulled behind her head, Dr. Hayne found no evidence of sexual assault.

¶7. There was a ten to twelve inch long gash in the ceiling of the laundry room where Evangela Boyd was killed. Further, Dr. Hayne testified that the wounds sustained by all three victims could have been caused by "a machete, a hatchet, an ax, a kizer blade or similar type weapons, weapons that would have a relatively sharp edge, would have some significant weight and would provide a broad cutting surface."

¶8. Verline Boyd had left her shift as a salad maker at the Piccadilly Cafeteria in the Southland Mall in Whitehaven, Tennessee, at some time between 8:45 and 8:50 p.m. on the night of January 6, 1993.

The drive from Whitehaven to Boyd Road was approximately twenty-two-and-one-half miles and took about twenty-five minutes. She was found by the front door, with her keys still in her hand and wearing a jacket.

¶9. At the crime scene, investigators focused on bloody shoeprints found on the porch and front door threshold. Mississippi State Highway Patrol Criminal Investigator, Lieutenant Bill Ellis and Scotty Wood, Chief Investigator for the DeSoto County Sheriff's Department, made a periphery examination of the Boyd property. They identified shoeprints consistent with those found on the porch and threshold near Verline Boyd's car and traveling to and from the Boyd residence along a dirt field road leading to Barbee Road, about a quarter of a mile away. Officer Wood testified that they found a print about twenty yards from the Boyd residence, near the road, as well as additional prints going both directions along the dirt path. The shoeprints ultimately led authorities to the home of twenty-four year old Sherwood Brown, where he had been staying with his parents. It was raining at the time and, as Wood testified, it was a race against time to take photographs and make plaster casts of several prints before the heavy rains began.

¶10. That afternoon, Sheriff Riley talked by telephone with Brown, who was at work at Enco Materials on Highway 78 in the vicinity of Olive Branch, Mississippi, and told him that authorities wanted to speak with him. When Officers Wood and Ellis arrived at the business a few minutes after 5 p.m., Brown had left. The warehouse manager had given him a ride to the bus station at Shelby Drive and Elvis Presley Boulevard in Memphis. Wood spotted a shoe print in some dust on the floor of the warehouse where he worked that appeared to match those they had seen at the Boyd house, as well as along the footpath. He later received a phone call from a pawnshop owner that Brown had purchased a gun that day. Lieutenant Ellis testified that they made several fruitless attempts to locate Brown at his wife's house on Shadowline Road in Memphis as well as at his girlfriend's home in Coldwater, Mississippi. He later learned that Brown had gone to the Villa Inn Motel on Highway 61 in South Memphis. Along with Memphis detectives, he went to the motel and "found that a person identified as Sherwood Brown had checked into that motel under the name of Sherwood Jones and gave the Shadowline address." Brown was no longer there.

¶11. After Wood and Ellis' unsuccessful efforts to locate Brown, and friends and relatives in the Eudora Community were unable to find him there, DeSoto County authorities contacted the Memphis Police Department, since Brown had more relatives and contacts in Memphis. They met with the city's Homicide Bureau and Tactical Unit on Friday, January 8, 1993, and advised them that Brown was wanted in connection with a triple homicide, that he was armed and had a history of violent behavior, and that because of shoeprints and the large quantity of blood at the scene, his shoes and clothes had possible evidentiary value.

¶12. Brown called his friend, James Coleman "Chick" Jones around 6:00 p.m. on Friday afternoon, January 8, 1993. He asked Jones to meet him at the Villa Inn Motel. Jones testified that when he arrived, Brown was not in his room, but hiding around the corner, and explained to him that he had wanted to make sure that Jones wasn't being followed. Jones further stated that Brown told him that he was running from the police. At Brown's request, the two went to pick up Brown's wife, Angela, with Brown hiding in the backseat of the car. After they brought Angela Brown back to her home, Jones and Brown went back to the motel for several hours. He then testified that Brown told him that he had knocked on the door of Mrs. Boyd's house, and when Evangela answered the door, "[t]hey go

into another room, start talking and flaunting around and feeling on her or whatever,"[(1)] Betty Boyd was supposed to have been at church, but she was at home and when she saw Brown, they argued and he grabbed "something similar as he described a joe blade" and hit her. Jones recalled that Brown told him:

> After that, he continues to flaunt with the little girl. He said he fucked her. She was trying to fight back, so he just beat her some so she was temporarily unconscious, and as she was in the midst of fighting back she was getting cut at the same time.

He then told Jones that he heard a door shut and thought it was one of the Boyd boys. He went to the front door, stood behind it, and when Verline Boyd came in, hit her on the back of the head. After that, he said, Evangela was trying to leave, and he had to stop her, so he just grabbed "whatever he grabbed and just stopped her, cut, her, hatchet or whatever, just he stopped her." He told Jones that he walked home along the path. Jones stated that while they were talking, Brown was very nervous, wild, angry and upset, constantly shaking and smoking cigarettes. At one point, he put a gun to his head. Jones told Brown that if he didn't turn himself in, that he was going to call the sheriff. Jones later called Sheriff Riley and told him that Brown was at the Villa Inn.

¶13. Brown was arrested at the Memphis home of his aunt shortly after midnight on January 11, 1993 by officers of the Memphis Tactical Unit. At the time of his arrest, Brown was wearing only his underwear, and because it was a cold, rainy night, pointed out his shoes and overcoat to Officer Thomas Helldorfer. Having been advised of the potential evidentiary value of Brown's shoes and any clothing, his request to wear the items was denied and the shoes and coat, as well as two guns and an ax found at the house, were taken into custody.

¶14. In his statement to Officers Wood and Ellis, made at the Memphis Criminal Justice Center, Brown denied that he had been on Boyd Road the Wednesday night of the murders; rather, he stated that he had arrived at his parents' house at around 8:00 p.m. and had gone straight to bed. He stated that he had smoked some marijuana and drunk some beer. When officers confronted him with corroborated statements from friends he'd been with that night and accused him of lying, he became defensive, admitted that he'd also smoked some crack cocaine and told them that he wasn't admitting anything; they would have to prove it. At the suppression hearing, Brown denied that he had been advised of his rights or that he had signed a waiver of rights, and charged that Woods had started screaming at him, calling him a liar and along with "three or four of them," had whipped him.

¶15. Because there was evidence that the victims had struggled with their assailant, Officer Ellis asked Brown to remove his shirt for examination of his upper torso during the interrogation. Wood testified that they observed a cut on his left wrist and one on the little finger of his right hand. Ellis photographed the injuries. In his statement, as well as in his testimony at the suppression hearing, Brown indicated that he had gotten the cut on his wrist at work and the one on his finger while fighting with his girlfriend. At the trial, experts in the area of oral pathology and forensic odontology debated whether the cut on Brown's left wrist could have been a bite mark.

¶16. Brown' size twelve Fila running shoes, the threshold of the Boyd home as well as boards taken from the porch, three pieces of broken glass, photographs of shoe prints from the scene and casts made from the impressions in the mud likewise were subjected to expert scrutiny. Geary Kanaskie, an expert in the field of shoeprint comparison for the Federal Bureau of Investigation, focused on the

toe design of the left shoe, which corresponded with the bloody prints left on the porch and threshold of the Boyd residence, as well as with the photographs and cast impressions made at the scene. The toe design further corresponded in size with Brown's size twelve Fila running shoes. He indicated that approximately twenty-three of the photographs submitted for his analysis corresponded with Brown's shoes, several showed a different design and others did not reveal a clear design impression. Kanaskie noted that while Fila is one of the top three sellers of running shoes, shoes as large as those submitted for comparison are not big sellers. He further testified that the company has marketed as many as three or four hundred styles of shoes, the design of the sole is unique to each particular line or style.

¶17. Joe Errera, a forensic serologist for the Federal Bureau of Investigation, tested Brown's Fila running shoes for the presence of blood, as well as the prints left on the metal threshold and wooden porch boards. He explained that he first performed a visual inspection of the item submitted for analysis to determine if there are any stains to be tested. He then performed what he described as "a screening test for the possible presence of blood," followed by a confirmatory test, a chemical test that allows him to absolutely determine that blood is present. He found no evidence of blood on the right shoe. On the left shoe, however, toward the toe and mid-section, he testified that "there were two areas which upon applying he chemical screening test for the possible presence of blood tested positive." Clarifying his efforts at confirmatory testing, he noted that, as distinguished from a stained item that has been left undisturbed, "environmental interactions with an item from temperature and bacteria and actual physical removal of a stain can all come into play to remove blood from an item to the point where my tests cannot specifically detect it."

¶18. Brown was indicted by a grand jury of the DeSoto County Circuit Court for the murders July 28, 1994. Counts 1 and 2 of the indictment charged him with killing Betty and Verline Boyd in violation of Miss. Code Ann. § 97-3-19(1)(a), as an habitual offender. Count 3 charged him with the murder of Evangela Boyd, a child under the age of fourteen, while "engaged in the commission of the crime of felonious abuse and/or battery" as defined in § 97-5-39(2), in violation of § 97-3-19(2)(f), also as an habitual offender. He was arraigned on August 19, 1994 in the Circuit Court of DeSoto County.

¶19. Brown's motion for change of venue was granted on February 24, 1995, transferring the jury selection proceedings to Lafayette County. The actual trial was held in March of 1995 in DeSoto County. He was found guilty on all three charges. Considering the capital murder charges arising from the death of Evangela Boyd, the jury unanimously found that the aggravating circumstances of:

a) The Capital Murder was committed by a person under sentence of imprisonment.

b) The defendant was previously convicted of another capital offense or a felony involving the use of [sic] threat of violence to the person.

c) The capital offense was committed while the defendant was engaged in the commission of a felonious abuse and/or battery of a child.

d) The capital offense was committed for the purpose of avoiding or preventing a lawful arrest.

e) The capital offense was especially heinous, atrocious or cruel.

are sufficient to impose the death penalty and that there are insufficient mitigating circumstances to outweigh to outweigh [sic] the aggravating circumstances; and we unanimously find that the Defendant should suffer death.

¶20. The sentencing order on Counts 1 and 2 was entered on April 7, 1995. On Count 1, Brown was ordered to serve a life sentence in the custody of the Mississippi Department of Corrections pursuant to Miss. Code Ann. § 99-19-81, without eligibility for parole or other reduction of sentence, consecutively with revoked time in Causes No. 4966 and 5324 in the Circuit Court of DeSoto County, and, on Count 2, a life sentence, also pursuant to § 99-19-81, to run consecutively with the sentence for Count 1.

¶21. Brown filed a motion for a new trial, a motion for jnov, a motion for jnov as to sentence and a motion for a new sentencing hearing. The circuit court overruled his various motions on April 7, 1995. He now appeals his conviction and sentence.

## ARGUMENTS AND DISCUSSION OF THE LAW

### I. WHETHER THE TRIAL COURT ERRED IN REFUSING TO SUPPRESS THE SHOES AND CLOTHING SEIZED FROM BROWN

¶22. Because of shoe prints found at the scene and at Brown's work place, Memphis police had been advised by DeSoto County authorities that his shoes might have evidentiary value. At the time of Brown's arrest, therefore, the arresting officers, following standard procedures, seized his shoes and clothing.[2] Nevertheless, Brown filed a motion to suppress evidence of any shoeprint comparisons or examination of his shoes for blood, asserting that the shoes were taken from him without a search warrant, probable cause or his valid consent. After hearing testimony at the pretrial motions hearing from Scotty Wood, investigator for the DeSoto County District Attorney's Office, and Memphis police officers, Thomas Helldorfer and Barry Lane, the circuit court found that the officers had probable cause to arrest Brown and seize his clothing and shoes, and that there was no evidence of overreaching, overstepping or denial of his constitutional rights. The motion to suppress the shoes and any additional evidence that might be gleaned therefrom was overruled.

¶23. Brown relies solely on *Ferrell v. State*, 649 So. 2d 831 (Miss. 1995) to support his argument that because there was no reason to believe that he would destroy evidence or that he was in possession of a weapon, the seizure of his shoes from plain view in the living room of his aunt's house, where he was arrested, violated his fourth amendment rights. His reliance on *Ferrell,* however, is misplaced. Ferrell was stopped for speeding and arrested for speeding and driving with a suspended license. *Ferrell,* 649 So. 2d at 832. While he was in the patrol car, one of the officers who allegedly had gone to retrieve Ferrell's keys from his car noticed a matchbox on the passenger's seat. *Id.* Under the matchbook, he found a yellow pill, which aroused his suspicions. *Id.* He then "noticed" another matchbox between the two front seats, opened it and discovered nine rocks of crack cocaine. *Id.* at 832-833. Consequently, Ferrell was tried and convicted of possession of crack cocaine. *Id.* at 832.

¶24. On review, this Court found that the search of Ferrell's car was not valid either as a search incident to arrest or a plain view search. Citing *Cupp v. Murphy,* 412 U.S. 291, 295, 93 S. Ct. 2000,

2003, 36 L. Ed. 2d 900 (1973), we explained that, "[i]n the case of a search incident to arrest, the exception to the warrant requirement is founded upon the reasonable concern that the arrestee might have a weapon on his person or within reach, and that he may attempt to destroy evidence which is within his grasp." *Ferrell,* 649 So. 2d at 833. Ignoring the plain view search discussion in *Ferrell*, Brown asserts that because he had already been arrested in his underwear, handcuffed, and like Ferrell, placed in a patrol car, there was no reason to believe that he would destroy evidence or that he was carrying a weapon. He therefore asserts that the seizure of his shoes was illegal.

¶25. As distinguished from the matchbox containing cocaine in Ferrell's car, the Fila running shoes in question were out in plain view by a coffee table in the room where the officers were standing. Brown, not wanting to go out into the cold, rainy night without his shoes, pointed them out to authorities. The *Ferrell* Court, discussing the plain view exception, quoted with approval *United States v. Villarreal*, 963 F.2d 770, 776 (5th Cir. 1992), as follows:

> The plain view exception is intended to allow police officers to seize *incriminating* items that are discovered in the course of their legitimate activities, [citations omitted], not to justify warrantless, exploratory searches of containers that purport to contain innocuous materials.

*Ferrell,* 649 So. 2d at 834. The record makes clear that the Memphis police officers were engaged in a legitimate activity -- the legal arrest of Sherwood Brown; that they had been advised of the evidentiary value of his shoes, and that the shoes were in plain view.

¶26. *Shell v. State*, 554 So. 2d 887 (Miss. 1989), *rev'd on other grounds*, 498 U.S. 1, 111 S. Ct. 313, 112 L.Ed. 2d 1 (1990), further reminds us that "[i]t is a long-standing rule in this, and other jurisdictions that, pursuant to a lawful arrest, law enforcement officials may seize personal effects and clothing from one who has been arrested." *Shell,* 554 So. 2d at 896. Moreover, *Upshaw v. State*, 350 So. 2d 1358 (Miss. 1977), expressly rejects Brown's argument that seizure of clothing pursuant to a lawful arrest violates a defendant's fourth amendment rights. In both *Upshaw*, where the defendant's clothing was seized from him upon his arrival at the jail, and in *Shell,* where the defendant's shoes were discovered and seized during a search of his trailer, we followed *Wright v. State*, 236 So. 2d 408 (Miss. 1970), which provides that a search may be necessary for many reasons, including "to discover weapons and means of escape; to prevent means of injury to the prisoner and others; to discover necessary medical requirements; *to discover evidence in connection with the charge for which accused was arrested*; to discover wounds and need for immediate first aid, and to preserve the property of the defendant." *Shell,* 554 So. 2d at 896; *Upshaw*, 350 So. 2d at 1363 (both quoting *Wright*, 236 So. 2d 411-412 (emphasis added)). Considering these authorities and the facts of the case, we do not hold the circuit court in error for refusing to suppress evidence of Brown's shoes and clothing.

## II. WHETHER THE TRIAL COURT ERRED IN REFUSING TO SUPPRESS THE PORTION OF BROWN'S STATEMENT RELATIVE TO HIS PRIOR DRUG USE

¶27. Brown first told arresting officers that he'd smoked marijuana on the night of the murders. After he was confronted with evidence that others with him that night had said that he was smoking crack cocaine, Brown became defensive and admitted that he'd traded some marijuana for crack. Finding that Brown was not under investigation for drug-related charges and that the reference was just part of his statement, the circuit court overruled his motion to suppress any references to drug use.

During the sentencing phase of the hearing, Dr. Marcia Little, a psychologist testifying on Brown's behalf, stated that "he has used alcohol, marijuana and crack cocaine and was using those substances before the alleged incident happened."

¶28. Brown now asserts that the part of his statement referencing drug use on the night the Boyds were murdered is inadmissible evidence of other crimes. He complains that the trial court's ruling on the matter resulted in his decision to not testify.

¶29. Miss. R. Evid. 404(b) provides that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

This Court has held that "where another crime or act is 'so interrelated [to the charged crime] as to constitute a single transaction or occurrence or a closely related series of transactions or occurrences, ' proof of the other crime or act is admissible." *Ballenger v. State,* 667 So. 2d 1242, 1257 (Miss. 1995)(quoting *Duplantis v. State,* 644 So. 2d 1235, 1246 (Miss. 1994)). The "acid test" is whether the evidence is relevant to the purposes for which it is sought to be introduced. *Cotton v. State,* 675 So. 2d 308, 314-315 (Miss. 1996)(quoting *Caldwell v. State,* 443 So. 2d 806 (Miss. 1983)).

¶30. Brown was not been convicted on drug-related charges. His statements to authorities about his marijuana and/or crack cocaine use were part of his responses to questions about where he had been and what he done the night of the Boyd murders. The State sought to introduce the statements to show the discrepancies which arose during Brown's interrogation, not to show his character or that he was acting in conformity therewith. It was relevant, therefore, to the veracity of Brown's statement to authorities that he had not been near the Boyd house that night. We do not find the circuit court in error for refusing to suppress evidence of Brown's drug use on the night the Boyds were murdered.

> III. WHETHER THE TRIAL COURT ERRED IN RULING THAT BROWN SHOULD BE TRIED WHILE IN LEG IRONS

¶31. At the February 24, 1995 hearing on pretrial motions, Brown filed a motion to preclude the Sheriff's Department from bringing him into the courtroom in shackles and to limit the number of uniformed law enforcement present during the trial. The circuit judge, noting the court's discretion in the matter and the sheriff's concern that Brown posed a security risk, ruled that he would hold the motion open and stated that he would recommend that some of the law enforcement officers dress in civilian clothes. On the first day of jury selection at the Lafayette County Courthouse, Brown was brought into the building in waist shackles and into the courtroom, itself, in leg and hand shackles. The circuit court questioned Chief Ronald Clayton, who was charged with transporting Brown between the DeSoto County Jail and the Lafayette County Courthouse, where jury selection took place. Clayton testified:

> Sherwood's a big, stout, young man, and he's been in numerous fights back at the jail. He's caused a lot of problems in the jail, and we've had to transport him almost on a continuous daily

basis to the doctor. And we feel like that's a security risk taking him back and forth to the doctor.

The circuit court ruled that he would allow Brown to be secured with leg irons, stating:

> I have to rely heavily upon what law enforcement tell[s] me in these situations -- that we will let the leg irons or whatever you call them, the ankle chains, remain. His hands can be free so he can write, review documents, whatever he needs to do to help counsel. But he is a large man. He's facing three murder charges as an habitual offender. I'd rather be safe and at least keep his feet where his ability to move would be severely limited.

The circuit court then overruled Brown's motion for a mistrial, which was based on the fact that he was taken through the building and to the door of the courtroom in waist shackles. The record does not reflect whether Brown was shackled during the week-long trial in DeSoto County.

¶32. Brown now asserts that the circuit court erred in ruling that he could be kept in leg irons during the trial. He relies on *Rush v. State,* 301 So. 2d 297 (Miss. 1974), for the proposition that restraints should be used only "in exceptional cases where there is evident danger of his escape or in order to protect others from an attack by the prisoner." *Id.* at 300. In that case, it was determined that the failure, through an oversight, to remove handcuffs from the defendant was neither prejudicial to him nor grounds for reversal. *Id.* Generally, we have not found the right to a fair trial to have been abridged where the defendant has been seen in the courtroom by the jury in shackles or handcuffs. *Lockett v. State*, 517 So. 2d 1317, 1329 (Miss. 1987)(defendant brought into courtroom with handcuffs on his wrists and ankles); *Hickson v. State*, 472 So. 2d 379, 383 (Miss. 1985)(defendant was handcuffed in the presence of the jury for between thirty minutes and an hour).

*¶33.* Whether the circumstances warrant the shackling of a defendant during trial is within the discretion of the trial judge. *Rush,* 301 So. 2d at 300. The record indicates that Brown is a very large man. Testimony was presented that he was engaged in frequent fights at the DeSoto County Jail and requested to be taken to the doctor almost daily, despite the absence of any diagnosed ailments or injuries. Moreover, the record does not indicate that he was visibly restrained during the actual trial or that jurors or prospective jurors observed the waist restraints at the Lafayette County Courthouse. Accordingly, the circuit court did not err in ruling that Brown could be tried in ankle shackles.

### IV. WHETHER THE TRIAL COURT ERRED IN INFERRING DURING VOIR DIRE THAT THERE WAS A POSSIBILITY OF PAROLE FOR BROWN

¶34. Brown correctly notes that the possibility of parole is not a proper subject for arguments or jury instructions. *Jackson,* 672 So. 2d 468, 488 (Miss. 1996)(trial court properly excluded "'life' means 'life'" argument by counsel); *Williams v. State*, 544 So. 2d 782, 798 (Miss. 1987)(Jessie Derrell Williams)(prosecutor's mention of the possibility of parole in the sentencing phase of a death penalty case constituted reversible error); *Williams v. State*, 445 So. 2d 798 (Miss. 1984)(Walter Williams, Jr.); *Griffin v. State*, 557 So. 2d 542, 553 (Miss. 1990)(prosecutor's mention of possibility of parole during closing arguments was one of cumulative errors warranting reversal). We find no merit, however, in his argument that the trial court's response to a potential juror's question during voir dire that parole is a function of the executive branch of the government and "it is not part of our function" implied that parole was a possibility for Brown. The circuit court only made clear that it is not within

the ambit of either the judge or the jury to become involved with the question of the possibility of parole. Moreover, no contemporaneous objection was made to the circuit court's comments. Only after another juror posed a question and a brief recess was taken did counsel for the defense move for a mistrial, asserting that the circuit court's response "was basically too far and that it implied something possibly less than life imprisonment." There is no basis for Brown's interpretation of the circuit court's response to the prospective juror's question as a comment on his eligibility for parole and we do not find the circuit court in error for refusing to grant a mistrial.

> V. WHETHER THE TRIAL COURT ERRED IN REFUSING TO GRANT A MISTRIAL UPON THE SHERIFF'S COMMENT THAT BROWN IMMEDIATELY WAS A SUSPECT IN THE CASE BECAUSE OF HIS PAST PROBLEMS WITH THE LAW

¶35. DeSoto County Sheriff James Albert Riley stated that he had known both the Boyd and the Brown families all of his life. He then testified that he dispatched investigators Scotty Wood and Bill Ellis to Brown parent's house because "we have had problems out of Sherwood Brown before . . ." Brown's attorney objected to the testimony, and in chambers, moved for a mistrial. The State's attorney indicated that "the witness was supposed to say that he was at the Brown residence because the footprints led them there [from the Boyd house]." The trial judge then admonished the jury that the sheriff's comments were improper because Brown was not on trial for any of his past unspecified problems with the law, and individually polled the jurors as to whether they could disregard the testimony. After each answered affirmatively, he denied Brown's motion for a mistrial. Sheriff Riley then testified that Brown was called for questioning because investigators had traced shoe prints consistent with the bloody tracks found on Mrs. Boyd's threshold and porch along a path from the Boyd property to Barbee Road, leading to his parents' home.

¶36. Brown contends that the circuit court's admonishment to the jury to disregard the Sheriff's improper comments served only to emphasize the fact that he had prior problems with the law. His reliance on *Edlin v. State,* 533 So. 2d 403 (Miss. 1988)*,* however, is misplaced. In that case, this Court found that the circuit court erred in allowing evidence that the defendant had intentionally run his car into his former girlfriend's car to show that in murdering the girl's current boyfriend, he was acting in conformity with his past behavior. *Edlin,* 533 So. 2d at 408. As distinguished from the case *sub judice*, the circuit court overruled Edlin's objections to the evidence and the prosecution emphasized the evidence in closing arguments to raise inferences of the defendant's proclivity for violence. *Id.* at 407-408. Moreover, no evidence was given that Brown had committed any specific crimes or bad acts. In *Bullock v. State*, 391 So. 2d 601(Miss. 1980), *cert. denied,* 452 U.S. 931 (1981), where the circuit court similarly refused to grant a mistrial after a witness made reference to Bullock's bad character, we stated:

> The trial judge sustained appellant's objection to the question and answer, and instructed the jury to disregard the answer, and asked the jury if they could disregard it. The jury gave the judge an affirmative reply. The answer was not responsive to the State's question, the trial judge directed the jury to disregard the question and answer, and it does not constitute reversible error.

*Id.* at 609. *See also* ***Foster v. State***, 639 So. 2d 1263, 1282 (Miss. 1994)(error cured by trial court's sustaining appellant's objection). Similarly, the circuit court's decision to sustain Brown's objection

and admonish and poll the jury rather than declare a mistrial does not warrant reversal of this case.

## VI. WHETHER THE TRIAL COURT ERRED IN ADMITTING GRUESOME PHOTOGRAPHS INTO EVIDENCE

¶37. Brown asserts that the circuit court erred in admitting photographs into evidence which he contends were gruesome and served only to prejudice and inflame the jury. He does not specify in his brief which pictures should not have been admitted, but alludes to Exhibits No. 25, 29, 44 and 45, which were entered into evidence in conjunction with the testimony of forensic pathologist Steven T. Hayne. Exhibit No. 25 is 3" x 5" color photograph taken at the crime scene showing the nude body of Evangela Boyd with chop wounds in her skull. Exhibit No. 29 is a 3" x 5" color photograph showing the injuries to her hand. Exhibits No. 44 and 45, also 3" x 5" color photographs, illustrate the chop wounds on Betty Boyd's face and skull. Other photographs depicting the victims' wounds were ruled inadmissible because they duplicated those already entered into evidence.

¶38. Brown relies on *Hewlett v. State,* 607 So. 2d 1097 (Miss. 1992), a manslaughter case, for the proposition that "photographs of a victim should not ordinarily be entered into evidence where a killing is not denied or identity of the victim is not an issue." *Hewlett* provides, however, that "[p]hotographs may nevertheless be admitted into evidence in criminal cases where they have probative value and where they are not so gruesome or used in such a way as to be overly prejudicial or inflammatory." 607 So. 2d at 1102.

¶39. In *Westbrook v. State,* 658 So. 2d 847, 849 (Miss. 1995), this Court found that photographs of a victim have evidentiary value when they aid in describing the circumstances of the killing, *Williams v. State*, 354 So. 2d 266 (Miss. 1978); describe the location of the body and cause of death, *Ashley v. State*, 423 So. 2d 1311 (Miss. 1982); or supplement or clarify witness testimony, *Hughes v. State*, 401 So. 2d 1100 (Miss. 1981).

¶40. The admissibility of photographs rests within the sound discretion of the trial court. *Jackson v. State,* 672 So. 2d 468, 485 (Miss. 1996); *Griffin v. State*, 557 So. 2d 542, 549 (Miss. 1990); *Mackbee v. State*, 575 So. 2d 16, 31 (Miss. 1990); *Boyd v. State*, 523 So. 2d 1037, 1039 (Miss. 1988). Moreover, the decision of the trial judge will be upheld unless there has been an abuse of discretion. *Westbrook*, 658 So. 2d at 849. The "discretion of the trial judge runs toward almost unlimited admissibility regardless of the gruesomeness, repetitiveness, and the extenuation of probative value." *Hart v. State*, 637 So. 2d 1329, 1335 (Miss. 1994)(quoting *Williams v. State*, 544 So. 2d 782, 785 (Miss. 1987)). In *Taylor v. State*, 672 So. 2d 1246 (Miss. 1996), we noted that photographs have been held "to be so gruesome and inflammatory as to be prejudicial in only one circumstance, a close-up photograph of a partly decomposed, maggot-infested skull." *Id.* at 1270 (citing *McNeal v. State*, 551 So. 2d 151 (Miss. 1989)).

¶41. The photographs at issue are not attractive, but they accurately depict the wounds inflicted upon the victims and the location and posture of the bodies at the scene of the crime. They certainly do not rise to the level of gruesomeness noted in *Taylor.* Dr. Hayne testified that the pictures would be "of value" over and above the information he could convey verbally to the jury about the lethal injuries. Accordingly, the circuit court did not abuse its discretion in admitting the photographs.

## VII. WHETHER THE TRIAL COURT ERRED IN REFUSING TO ALLOW EVIDENCE OF

THE CHILD VICTIM'S REMOTE SEXUAL ACTIVITY

¶42. Brown further contends that the circuit court erred in not allowing him to pursue cross-examination of Dr. Hayne regarding evidence of remote sexual activity discovered during the autopsy of Evangela Boyd. He claims that the evidence was relevant because the child's brother, Tony Boyd, once "a possible suspect" in the case had a prior rape conviction and "[i]t is clear that the victim in this case had likely been sexually assaulted by someone she would not, or could not, report to authorities."

¶43. Dr. Hayne testified that he found no evidence of gross sexual conduct at or near the time of death. On cross-examination, the circuit court upheld the State's objection to testimony that the defendant sought to elicit on the issue of remote sexual activity. A proffer was made wherein Dr. Hayne testified that the multiple old scars on the child's hymen were indicative of sexual activity occurring at least two to three weeks prior to her death.

¶44. The determination of relevance and admissibility is within the discretion of trial court. *Johnson v. State,* 666 So. 2d 499, 503 (Miss. 1995). It cannot be said that the circuit court erred in disallowing evidence not relevant to the charges against Brown.

> VIII. WHETHER THE TRIAL COURT ERRED IN REFUSING TO ALLOW A MISTRIAL AS A RESULT OF THE PREVIOUSLY UNDISCLOSED OPINIONS OF THE STATE'S SHOE PRINT EXAMINER

> IX. WHETHER THE TRIAL COURT ERRED IN REFUSING TO ALLOW A MISTRIAL AS A RESULT OF THE STATE'S FAILURE TO DISCLOSE EXCULPATORY MATTER IN DISCOVERY;

¶45. In these assignments of error, Brown assails the testimony of shoe print expert, Geary Kanaskie. He first asserts that the defense had not disclosed Kanaskie's testimony about *specific* rather than *general* characteristics of the shoe prints found at the scene which identified them as coming from a Fila running shoe like those of Brown's submitted for analysis and comparison. Kanaskie's inquiry focused on the toe design on the shoe, which corresponded with the bloody prints left on the porch and threshold of the Boyd residence, as well as with the photographs and cast impressions made at the scene. The toe design further corresponded in size with Brown's size twelve Fila running shoes. Brown appears to object to Kanaskie's emphasis on the identifying features of the toe of the shoe.

¶46. Brown further contends that prosecution failed to advise him of certain evidence which he asserts is exculpatory, to wit: that in addition to prints matching his running shoes, photographs revealed that there were other prints at or near the scene and along the path between the Boyd and Brown residences. Kanaskie testified that of the fifty-eight photographs submitted for his evaluation, twenty-three contained impressions that corresponded in design or size and design with Brown's Fila sneakers and the most of the remaining photographs that didn't show any footwear impressions at all.

¶47. Under Uniform Criminal Rule 4.06(e), in effect at the time of Brown's trial, each party is required to provide the other with any additional or supplemental material or information which is subject to disclosure. Brown's reliance on *Acevedo v. State,* 467 So. 2d 220 (Miss. 1985), however, is misplaced. In that case, the State failed to failed to provide the defense with information that its

expert forensic chemist had arrived at a "surprise" conclusion about the presence of gunpowder residue on the victim's hands, totally contrary to his original written findings that had been submitted to the defense. *Acevedo,* 467 So. 2d at 223-224. As distinguished from *Acevedo,* Kanaskie made no "surprise" conclusions or observations at trial. Even without the benefit of expert testimony, it is obvious from looking at the evidence of the bloody shoeprints with a naked layman's eye that attention would focus on the toe area of Brown's shoe, and further, that some of the prints photographed at the scene were of different shoes or because of the rain and mud, were indistinguishable, as Kanaskie testified. There is no merit, therefore, to his argument.

### X. WHETHER THE TRIAL COURT ERRED IN ALLOWING SPECULATIVE EXPERT TESTIMONY

¶48. Joe Errera, a forensic serologist for the Federal Bureau of Investigation, tested Brown's Fila running shoes. Framing the procedures in layman's terms, Errera explained that he first performs a visual inspection of the item submitted for analysis to determine if there are any stains to be tested. He then performs what he described as "a screening test for the possible presence of blood," followed by a confirmatory test, a chemical test that allows him to absolutely determine that blood is present. From that point, depending on the quantity of blood present, he can do blood typing and other tests. Based on his evaluation of Brown's shoes, he testified as follows:

> Looking at the two shoes, I'll take the K-2 right shoe first, I examined this particular exhibit, all the surface areas of it, using the screening test which I've described for you for the presence of blood, and that test as negative on the right shoe. There were no areas of that particular shoe that gave me any reactions that would indicate the presence of blood.

> However, on the left shoe there are two areas which upon applying the chemical screening test for the possible presence of blood screened positive. And those areas I arrowed. One was toward the toe of the left shoe, pointing toward the arrowed area there, and one was toward the mid section --

At that point, the defense objected that use of the term "possible" for the presence of blood rather than "probable" presence. The State's attorney explained that Errera was just using the descriptive name of the test that he performed. Brown now asserts that the evidence was speculative since the expert witness indicated that preliminary screening tests on one shoe "for the *possible presence* of blood tested positive." There is no merit to this assertion. Moreover, the relevance and admissibility of evidence is within the discretion of the circuit court. *Johnson,* 666 So. 2d at 503. Since the testing procedures used by the serologist and the results obtained from those tests were relevant to the issue of whether there was a link between Brown's running shoes and the bloody shoeprints at the scene, the circuit court properly admitted the testimony.

### XI. WHETHER THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR A DIRECTED VERDICT BASED ON THE STATE'S FAILURE TO PRESENT PROOF OF THE ALLEGED UNDERLYING FELONY OF CHILD ABUSE

¶49. When considering a motion for a directed verdict, "the trial judge must accept as true all evidence favorable to the State and all reasonable inferences flowing therefrom. Evidence favorable to the defendant must be disregarded." *Ellis v. State,* 667 So. 2d 599, 612 (Miss. 1995); *Noe v.*

*State,* 616 So. 2d 298, 302 (Miss. 1993). Following this standard, where there is sufficient evidence to support a guilty verdict, a motion for a directed verdict or a peremptory instruction should be denied. *Noe*, 616 So. 2d at 302; *Brown v. State,* 556 So. 2d 338, 340 (Miss. 1990).

¶50. Brown asserts that the State failed to make the independent showing of sexual assault or child abuse which he contends is necessary to elevate the murder of thirteen-year old Evangela Boyd to the level of capital murder. He argues that "there must be some independent showing of child abuse . . . To rule otherwise would mean that any murder of a child would constitute capital murder."

¶51. Count 3 of the indictment charged Brown with the murder of Evangela Boyd, a child under the age of fourteen, while "engaged in the commission of the crime of felonious abuse and/or battery" as defined in Miss. Code Ann. § 97-5-39(2), in violation of Miss. Code Ann. § 97-3-19(2)(f). Section 97-3-19(2)(f), which defines the crime of capital murder, states:

> (2) The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:

> (f) When done with or without design to effect death, by any person engaged in the commission of the crime of felonious abuse or battery of a child in violation of subsection (2) of section 97-5-39, or in any attempt to commit such felony;

Section 97-5-39 provides that "any person who shall intentionally (a) burn any child, (b) torture any child or, (c) except in self-defense or in order to prevent bodily harm to a third party, whip, strike, or otherwise abuse or mutilate any child in such a manner as to cause serious bodily harm, shall be guilty of felonious abuse and/or battery of a child . . . " One act alone may constitute abuse and/or battery; the "statute does not require that the abuse be dispensed over a period of time before a charge for felonious abuse will arise." *Jackson,* 672 So. 2d at 482 (quoting *Faraga v. State*, 514 So. 2d 295, 302 (Miss. 1987)).

¶52. Although it was not necessary to prove sexual battery or rape, evidence supporting the State's theory that Brown went to the Boyd house to have sex with Evangela is not totally irrelevant. While Dr. Hayne, the forensic pathologist, found no evidence of sexual assault, the girl's body was discovered nude with her bra pulled behind her head. Her wounds indicate that she had been abused, struck and mutilated consistent with the definition of felonious abuse and/or battery of a child provided in § 97-5-39. In addition to the fatal chop wounds to her head, Dr. Hayne identified chop wounds on her left shoulder that were up to four inches long; chop and stab wounds as well as large scrapes on her back; scrapes and abrasions on the right hip; multiple abrasions and lacerations near the right knee; multiple chop wounds to the right forearm and fracture in the ulna and radius of that arm; chop wounds on her right hand, one of which nearly severed her thumb; and lacerations to the fingers on her right had which had nearly severed them. Looking at this evidence in a light most favorable to the State, as we must, we do not find the circuit court in error for refusing to grant Brown's motion for a directed verdict on the capital murder charge.

## XII. WHETHER THE TRIAL COURT ERRED IN RULING THAT THE PROSECUTION COULD UTILIZE PRIOR TRANSCRIPTS FOR IMPEACHMENT PURPOSES

¶53. Brown asserts that the trial court erred in ruling that the prosecution could use for impeachment

purposes, were he to testify, transcripts from his February 19, 1993 parole revocation hearing and February 24, 1995 suppression hearing. The State sought to utilize the transcripts "to challenge Mr. Brown's credibility for tr uthfulness and veracity and also to challenge his recall, his recollection, and compare the different things he has said and done during the course of these court proceedings because all of these things were done after his arrest on January 11 or 12 of 1993." Brown suggests that this "tactic" was "improper," and contends that the court's ruling on this matter led to his decision not to testify.

¶54. Brown relies solely on *Stringer v. State*, 491 So. 2d 837, 841 (Miss. 1986), where this Court found that the circuit court erred in allowing into evidence nearly ninety percent of Stringer's testimony at his father's capital murder trial. Unlike the case *sub judice,* Stringer's testimony was not introduced for purposes of impeachment or rebuttal, but as an admission. The *Stringer* Court found that the prior testimony was hearsay, not fitting into the admission exception. *Stringer,* 491 So. 2d at 837. Brown's reliance on *Stringer*, therefore, is misplaced.

¶55. "Mississippi allows 'wide-open cross-examination of any matters affecting the credibility of the witness.'" *Tillis v. State,* 661 So. 2d 1139, 1149 (Miss. 1995)(quoting *Meeks v. State,* 604 So. 2d 748, 755 (Miss. 1992)). The right to impeach or attack a witness' credibility is secured both by the Mississippi Rules of Evidence and the confrontation clauses of the state and federal constitutions. *Tillis,* 661 So. 2d at 1149. The matters probed must be relevant. *Green v. State,* 631 So. 2d 167, 173 (Miss. 1994); *Johnston v. State,* 618 So. 90, 93 (Miss. 1993). *See also* Miss. R. Evid. 611(b). It is within the discretion of the circuit court to determine the relevance and admissibility of the evidence as long as our evidentiary rules are followed. *Johnson v. State,* 666 So. 2d 499, 503 (Miss. 1995). Only when there has been an abuse of discretion and a substantial right of a party has been abridged will this Court reverse. *Johnson,* 666 So. 2d at 503.

¶56. Brown does not enlighten us as to which transcripts or testimony in the prior hearings he found objectionable. Moreover, when the tables are turned, this Court has noted that transcripts from a prior proceeding "would be a valuable tool to an appellant either as a discovery device in preparation for trial or as a tool at trial for the impeachment of prosecution witnesses." *Lewis v. State,* 580 So. 2d 1279, 1285 (Miss. 1991). The circuit court, therefore, did not abuse its discretion in ruling that, *were Brown to testify,* statements made in prior hearings could be used on cross-examination to impeach his testimony.

> XIII. WHETHER THE TRIAL COURT ERRED IN RULING THAT ANGELA BROWN COULD NOT TESTIFY CONCERNING CONVERSATIONS BETWEEN SHERWOOD BROWN AND CHICK JONES RELATIVE TO THREATS THAT HAD BEEN MADE ABOUT SHERWOOD
>
> XIV. WHETHER THE TRIAL COURT ERRED IN REFUSING TO ALLOW ANGELA BROWN TO TESTIFY THAT SHERWOOD NEVER ADMITTED GUILT TO CHICK JONES AS MAINTAINED BY JONES
>
> XV. WHETHER THE TRIAL COURT ERRED IN REFUSING TO ALLOW ANGELA BROWN TO TESTIFY CONCERNING CHICK JONES' STATEMENT TO HER THAT HE HAD BEEN THREATENED BY LAW ENFORCEMENT

¶57. In each of these assignments of error, Brown faults the trial court for refusing to let his wife, Angela Brown, testify about conversations between Brown and Chick Jones, as well as Jones' statements to her. Jones testified at trial. Brown, however, asserts that Ms. Brown's additional testimony was necessary to rebut certain statements that he made.

¶58. Angela Brown's proffered testimony included the following statement:

Q. Okay. Would you relate to the Court Sherwood's appearance and attitude in the car.

A. He was scared.

Q. Okay. And why do you say that?

A. When we were on the way to the motel, Coleman said that, You know you need to turn yourself in, but if you do, the Boyds are looking for you, and they're going to kill you if they see you.

Q. Okay. Now, this is what Chick Jones said?

A. That's what Chick said.

Brown asserts that the statement is not hearsay since it was not offered to prove that his life had been threatened, but to show that Brown believed his life to be in danger and why he fled to Memphis, citing Miss. R. Evid. Rules 801(c) and 803(3). A proffer was made that Jones denied making such a statement. Had the alleged statement been made *prior* to the time that Brown went to Memphis and checked into a hotel room under an assumed name, there might be some merit to his argument. However, even assuming *arguendo* that the statement was admissible to show Brown's state of mind, he has not made any showing that he was prejudiced by its exclusion. ***Cole v. State***, 525 So. 2d 365, 373 (Miss. 1987).

¶59. Angela Brown further stated during her proffer that while she was with her husband and Jones, Brown never admitted any guilt to Jones. Jones testified that *after* he and Brown returned to the hotel *after* taking his wife back to her home, Brown told him about the murders and how they happened. Relying on ***West v. State,*** 553 So. 2d 8, 21 (Miss. 1989), Brown now contends that his wife's testimony was necessary to rebut Jones' testimony. However, the fact that Brown made no statements of guilt to Jones in the presence of his wife is not relevant and certainly does not serve to rebut Jones' testimony.

¶60. In her proffered testimony, Angela Brown also stated that sometime before Thanksgiving in 1994, Jones told her that he'd been "pressured" by Sheriff Riley. She testified that:

He said he had just gotten out of jail on some other matter and that Sheriff Riley had been pressuring him about -- he didn't say exactly. He just said he had been pressuring him and he was talking about -- talking about him being an accessory to this murder because he was driving him [Brown] around all the time.

Her testimony gives no indication of when the alleged "pressure" was put on Jones. On cross-examination, Jones denied that he was intimidated or threatened by authorities when he was

interviewed on January 19, 1993, after Brown's arrest. In a proffer, Jones also denied that Sheriff Riley threatened to charge him as an accessory after the fact to murder. It was acknowledged that he was available to testify. Brown asserts that the proffered testimony was relevant to Jones' motives for testifying. Whatever Jones' "motives" for testifying, the jury heard sufficient evidence to enable it to weigh his credibility as a witness without the admission of hearsay evidence.

¶61. We have stated that "under certain rare circumstances, the due process clause may require that the hearsay rule not be applied mechanistically to defeat the ends of justice." *Cole,* 525 So. 2d at 373 (citing *Green v. Georgia,* 442 U.S. 95, 99 S.Ct. 2150, 60 L. Ed. 2d 738 (1979)). We cannot say that the ends of justice were defeated by the circuit court's refusal to admit the proffered hearsay testimony into evidence.

XVI. WHETHER THE TRIAL COURT ERRED IN GRANTING INSTRUCTIONS S-6 AND S-7

¶62. Brown complains that the circuit court erred in allowing the jury to be given instructions on flight. Instructions S-6 and S-7 provide as follows:

S-6

"Flight" is the evading of the course of justice by voluntarily withdrawing one's self in order to avoid arrest, detention, or the institution or continuance of criminal proceedings, regardless of whether one leaves the jurisdiction.

S-7

Flight is a circumstance from which guilty knowledge and fear may be inferred. If you find from the evidence in this case beyond a reasonable doubt that the Defendant SHERWOOD BROWN did flee or go into hiding, such flight or hiding of SHERWOOD BROWN is to be considered in connection with all other evidence in this case. You will determine from all of the facts whether the flight was from a conscious sense of guilt or whether it was caused by other things, and give it such weight as you think it is entitled to in determining the guilt or innocence of SHERWOOD BROWN.

¶63. "[A]n instruction that flight may be considered as a circumstance of guilt or guilty knowledge is appropriate only where that flight is unexplained and somehow probative of guilt or guilty knowledge." *Westbrook v. State*, 658 So. 2d 852, 856 (Miss. 1995)(quoting *Fuselier v. State*, 468 So. 2d 45, 57 (Miss. 1985)). When determining whether a flight instruction is appropriate, we further have explained that two considerations are paramount:

(1) Only unexplained flight merits a flight instruction.

(2) Flight instructions are to be given only in cases where that circumstance has considerable probative value.

*Banks v. State*, 631 So. 2d 748, 751 (Miss. 1994) (quoting *Pannell v. State*, 455 So. 2d 785, 788 (Miss. 1984)). *See also **Mack v. State***, 650 So. 2d 1289, 1308 (Miss. 1994)(flight evidence and

instruction appropriate only where probative of guilt or guilty knowledge of crime charged and where there are no independent reasons for flight).

¶64. Brown contends that "any departure . . . was readily explained because of his fear that someone was going to kill him." He relies on *Pannell* for the proposition that when a defendant's explanation of his departure is not unbelievable, a flight instruction is not warranted. In *Pannell*, an aggravated assault case where the defendant left the scene, drove his sister home, and went to the home of the sister with whom he had been staying, where he immediately notified authorities of the shooting incident, this Court found that there was no foundation in the record upon which to base a flight instruction. *Pannell,* 455 So. 2d at 787-788. Rather than issuing a broad proclamation that a flight instruction is not warranted when the defendant gives a plausible explanation for his actions, as Brown suggests, the Court stated merely that "Pannell's explanation for his departure from the scene of the shooting was wholly uncontradicted and certainly not incredulous or unbelievable." *Id.* at 788.

¶65. The record indicates that Brown left his workplace in Olive Branch for Memphis after assuring authorities that he would be there to talk with them, purchased a handgun, and checked into a Memphis motel under an assumed name. He remained a fugitive for several days until he was arrested by Memphis police. Under these facts, evidence of flight was probative of guilt or guilty knowledge and thus the instruction on flight was warranted.

## XVII. WHETHER THE TRIAL COURT ERRED IN GRANTING S-1 IN THE SENTENCING PHASE

¶66. Brown contends that the "heinous, atrocious or cruel" language of Sentencing Instruction S-1 is unconstitutionally vague, indefinite and uncertain, in violation of the eighth and fourteenth amendments to the United States Constitution and sections 14, 26 and 28 of the Mississippi Constitution. He argues because the instruction is couched in disjunctive terms, the jurors would not have to reach a unanimous decision; that is, "[f]our jurors could conclude that the offense was heinous, four that it was atrocious, and four that it was cruel." Instruction S-1 provides as follows:

The Court instructs the jury that in considering whether the capital offense was especially heinous, atrocious or cruel; heinous mean[s] extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to, or enjoyment of the suffering of others.

In order for you to find in this case the aggravating circumstance that the crime was especially heinous, atrocious, or cruel, you must unanimously find beyond a reasonable doubt that the capital offense was accompanied by such additional acts as to set the crime apart from the norm of capital offenses -- that is, the crime was conscienceless, pitiless, or unnecessarily tortuous to the victim.

¶67. In *Shell v. Mississippi*, 498 U.S. 1, 111 S. Ct. 313, 112 L. Ed. 2d 1 (1990), the United States Supreme Court found that used alone, language like that used in the first paragraph of Instruction S-1 was not constitutionally sufficient.[3] However, when coupled with the language of the second paragraph of the instruction, describing an especially heinous, atrocious or cruel murder as one which is

accompanied by such additional acts as to set the crime apart from the norm of capital offenses -- that is, that the crime was conscienceless, pitiless or unnecessarily torturous to the victim[,]

such an instruction was determined by the United States Supreme Court to be a proper limiting instruction to the *Shell* language in *Clemons v. Mississippi*, 494 U.S. 738, 110 S. Ct. 1441, 1108 L. Ed. 2d 725 (1990). Finally, in *Hansen v. State*, 592 So. 2d 114 (Miss. 1991), we noted that when considering whether a crime could be considered "especially heinous, atrocious or cruel,"

barbarity sufficient to satisfy this aggravating circumstance can be demonstrated by showing that the defendant utilized a method of killing which caused serious mutilation, where there is a dismemberment of the corpse, where the defendant inflicted physical or mental pain before death, or where a lingering or tortuous death was suffered by the victim.

*Id.* at 152 (quoting *Pinkney v. State*, 538 So. 2d 329, 357 (Miss. 1988), *vacated on other grounds,* 494 U.S. 1075, 110 S. Ct. 1800, 108 L. Ed. 2d 725 (1990)). Although this aspect of *Pinkney* was not addressed in the United States Supreme Court's review of the case, similar limiting language to that used in Instruction S-1 was approved in *Lewis v. Jeffers*, 497 U.S. 764, 110 S. Ct. 3092, 3096, 111 L. Ed. 2d 606, 615-16 (1990) and *Walton v. Arizona,* 497 U.S. 639, 110 S. Ct. 3047, 3053, 111 L. Ed. 2d 511, 523-24 (1990). *See also Jackson,* 672 So. 2d at 491-492.

¶68. The language in Instruction S-1 is consistent with the limiting language approved by this Court as well as by the United States Supreme Court. It has sufficiently "refined and narrowed the aggravating circumstance of 'heinous, atrocious or cruel' and channeled in a principled way the jury's sentencing discretion, excluding the arbitrary and the capricious to the extent reasonably practicable and has fairly facilitated proportionality review." *Hansen*, 592 So. 2d at 152. There is, therefore, no merit to this assignment of error.

### XVIII. WHETHER THE TRIAL COURT IMPROPERLY GRANTED INSTRUCTION C-3 DURING THE SENTENCING PHASE

¶69. The trial court's Instruction C-3 instructed the jury on the aggravating and mitigating factors it should consider and weigh in determining whether to impose the death penalty. Brown now asserts that the circuit court erred in instructing the jury that it could consider the aggravating factor that the capital offense occurred during the commission of the crime of felonious abuse and/or battery of a child. He contends that this is an "improper doubling of aggravation." He further argues that it allows the State to use an element of the crime as an aggravating circumstance.

¶70. We have approved the use of the underlying felony as an aggravating factor as part of the statutory sentencing scheme set forth in Miss. Code Ann. § 99-19-101. *Holly v. State*, 671 So. 2d 32, 39-40 (Miss. 1996); *Jackson*, 672 So. 2d at 490-491. In *Jackson*, where the same aggravating circumstance was allowed as a factor for the jury to consider in sentencing a defendant charged with the capital murder of his four young nieces and nephews, we explained:

The United States Supreme Court has held that as long as the class of defendants eligible for the death penalty is narrowed during the guilt or sentencing phase of the trial, "the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this

sentence constitutionally infirm." ***Lowenfield v. Phelps***, 484 U.S. 231, 246, 108 S. Ct. 546, 555, 98 L. Ed. 2d 568 (1988). In ***Ladner v. State***, 584 So. 2d 743 (Miss. 1991), this Court, again rejecting the contention that aggravating factors could not be "stacked," reiterated ***Lowenfield***, stating:

> The United States Supreme Court held that when constitutionally required narrowing of the class of persons eligible for the death penalty is accomplished by the legislative definition of capital offenses in the guilt phase (as is done in Louisiana and Mississippi), the jury's further narrowing of the sentencing phase is not constitutionally required. [***Lowenfield,*** 484 U.S.] at 241-46, 108 S. Ct. at 552-55, 98 L. Ed. 2d at 579-83.

***Jackson,*** 672 So. 2d at 490-491. Accordingly, there is no merit to this assignment of error.

### XIX. WHETHER THE TRIAL COURT ERRED IN FAILING TO ORDER A NEW TRIAL AS A RESULT OF IMPROPER CLOSING ARGUMENT

¶71. Brown contends that the prosecution's reference to "a silent witness" in the closing arguments of the penalty phase of the trial should have warranted a new trial. Although no contemporaneous objection was made at the trial, itself, the argument was raised in his motion for a new trial, thus preserving the issue for appeal. ***Foster,*** 639 So. 2d at 1289.

¶72. Brown relies on ***Ladner v. State***, 584 So. 2d 743,754 (Miss. 1991), for the proposition that in addition to the requirement that the prosecutor can make no direct reference to the defendant's failure to testify, "the prosecutor is also prohibited from referring by innuendo and insinuation to the defendant's failure to testify." In the case *sub judice*, only by pulling the words "silent witness" from the page without even the vaguest reference to the context from which they arose, as Brown has done, could the comment be even remotely construed as a reference to Brown's failure to testify. To the contrary, placed in its proper context, the reference clearly was to the victims of the crime and their inability to testify. There is no reference, no matter how oblique, to Brown's silence, rather it is clearly the stories the victims could tell to which the prosecution alludes. We do not hold the circuit court in error for refusing to grant a new trial on grounds that the prosecution made improper references to Brown's failure to testify.

### XX. WHETHER THE TRIAL COURT ERRED IN REFUSING TO GRANT A NEW TRIAL AS A RESULT OF PROSECUTORIAL MISCONDUCT

¶73. Brown alleges four incidents of prosecutorial misconduct arising over the course of the lengthy trial. "In appropriate circumstances, prosecutorial misconduct has been the basis for reversal of a defendant's conviction and sentence." ***Chase v. State,*** 645 So. 2d 829, 853 (Miss. 1994). However, in discussing the broad latitude afforded attorneys in making their closing arguments, this Court has stated:

> Counsel was not required to be logical in argument; he is not required to draw sound conclusions, or to have a perfect argument measured by logical and rhetorical rules; his function is to draw conclusions and inferences from evidence on behalf of his client in whatever he deems proper, so long as he does not become abusive and go outside the confines of the record.

*Minnick v. State,* 551 So. 2d 77, 93 (Miss. 1988)(quoting ***Johnson v. State,*** 416 So. 2d 383, 391 (Miss. 1982)). Indeed, we have held that "the prosecutor may comment on facts in evidence and may draw proper deductions therefrom." ***Johnson v. State***, 416 So. 2d 383, 391 (Miss. 1982).

¶74. Brown first argues that, during voir dire, the State misrepresented to potential jurors that there had been no other suspects in the case. He refers to the State's response to a question, indicating that there were no other suspects in the case. The trial judge rejected the idea of instructing the jury that Brown was the only suspect and advised the parties' attorneys that he would permit them to handle the situation with whatever strategy they deemed appropriate. In their opening statement, Brown's attorneys addressed the issue by stating:

> [BY MRS. BREWER:] . . . First of all, Mr. Williams mentioned to one of the ladies during the voir dire examination yesterday -- she asked, Was he the only suspect. Mr. Williams said, Yes. We believe that the State's own documents will disprove that Sherwood Brown was the only suspect in this case, and you'll be hearing more about that . . .

Although testimony by Sheriff Riley established that Tony Boyd, Verline Boyd's son and Betty Boyd's grandson, ultimately was not a suspect in the case, he was listed as such in discovery and his fingerprints, along with Brown's, were submitted to the State Crime Lab for testing. Any "misstatement" was fully explained to the jury during the course of the trial by the evidence presented. Moreover, since the trial court gave the defense the option of using whatever strategy it desired and Mrs. Brewer chose to address the issue in her opening argument, Brown should not now complain.

¶75. Brown next complains of the prosecution's comment to potential jurors that:

> I wish we weren't here today and so do you, but we are here and the Grand Jury in DeSoto County says that the reason we are here is because of what Mr. Brown did on January 6, 1993. We need not lose sight of that.

His attorney promptly objected and moved for a mistrial. The circuit court overruled the motion, but for all practical purposes, sustained the objection, explaining to the venire that "the function of a grand jury is a probable cause hearing" and that it was up to the jury to determine whether a crime was committed and if Brown did it. The State's attorney then advised the jury:

> The grand jury's charge is simply an accusation. As the Court said, the indictment is not evidence. It should not be considered as evidence by you. You've got to decide for yourself based on what you hear in court whether the man's guilty or not. Pure and simple.

Any "error" in the prosecutor's misstatement of the Grand Jury's function was cured when the judge, in effect, granted the objection and allowed the attorney to correctly articulate the grand jury's function. ***Foster,*** 639 So. 2d at 1282; ***Chase***, 645 So. 2d at 853.

¶76. Thirdly, Brown argues that during closing arguments, the State referred to evidence not presented during the course of the trial; that is, that certain testimony given by Coleman "Chick" Jones revealed that he knew details first presented at trial and not previously divulged to the public or the press and thus, could have come only from Brown's statements to him. He asserts that such

comments amounted to "testimony" by the prosecutor. Brown's attorneys raised no objections here or earlier in closing arguments where the State also posed a series of rhetorical "How would Jones have known if Brown hadn't told him" questions. (R.12 at 1329) Accordingly, his argument is procedurally barred. *Jackson,* 672 So. 2d at 481; *Ballenger v. State,* 667 So. 2d 1242, 1273 (Miss. 1995); *Chase v. State*, 645 So. 2d 829, 854 (Miss. 1994); *Hansen v. State*, 592 So. 2d 114, 139-140 (Miss. 1991). Moreover, "[t]he defendant who fails to make a contemporaneous objection must rely on plain error to raise the assignment on appeal." *Foster*, 639 So. 2d at 1289.

¶77. Finally, Brown asserts that the State inappropriately "challenged" the jury to disregard any mitigating evidence, labeling it as "excuses" and suggesting that anything offered by Brown was "unworthy, unworthy of mitigation." The jury was properly instructed on the weighing of aggravating and mitigating circumstances through Instructions C-2 and C-3. There is a presumption that the jury will follow the instructions given to them by the court. *Johnson v. State*, 475 So. 2d 1136, 1142 (Miss. 1985). Given the broad leeway attorneys are allowed in their closing arguments, *Ballenger,* 667 So. 2d at 1272, and the fact that the jury was properly instructed, there is no merit to Brown's argument.

¶78. Brown also raised several assignments of error which were unsupported by any meaningful argument or relevant authority. Accordingly, we do not address those issues on appeal. *McLain v. State,* 625 So. 2d 774, 781 (Miss. 1993); *Baine v. State,* 604 So. 2d 249, 255 (Miss. 1992).

## CONCLUSION

¶79. Pursuant to Miss. Code Ann. § 99-19-105(3)(1995), in addition to reviewing the merits of those issues raised by the defendant, this Court is required to determine:

>    (a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;

>    (b) Whether the evidence supports the jury's or judge's findings of a statutory aggravating circumstances as enumerated in Section 99-19-101; and

>    (c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

¶80. Other capital murder cases decided by this Court, as set forth in the Appendix below, have been reviewed and compared with the case and sentence *sub judice*. Having done so, it cannot be said that the sentence of death in this case was influenced by passion, prejudice, or any other arbitrary factor. Further, the evidence supports the jury's findings of statutory aggravating circumstances as listed in Miss. Code Ann. § 99-19-105(5)(1995). Considering the facts of the crime committed, the sentence of death in this case is neither excessive nor disproportionate to those cases in which such sentence has been imposed and upheld.

¶81. Brown's conviction of capital murder and sentence to death is supported by the evidence in the record. Moreover, as this Court recently explained in *Walker v. State,* 671 So. 2d 581 (Miss. 1995):

>    There never has been a perfect trial. As long as humans conduct and participate in trial of lawsuits, there will not be such a trial. This Court has said many times that a defendant is not

entitled to a perfect trial, only a fair trial. ***Sand v. State***, 467 So. 2d 907 (Miss. 1985); ***Bell v. State***, 443 So. 2d 16 (Miss. 1984); ***Palmer v. State***, 427 So. 2d 111 (Miss. 1983); ***Shaw v. State***, 378 So. 2d 631 (Miss. 1979); ***Stringer v. State***, 500 So. 2d 928 (Miss. 1986).

*Id.* at 629-630. Brown received a fundamentally fair trial. We therefore affirm his conviction and death sentence.

**¶82. COUNT I: CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT AS AN HABITUAL OFFENDER IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED. COUNT II: CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT AS AN HABITUAL OFFENDER IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED. SENTENCE IN COUNT II SHALL RUN CONSECUTIVELY WITH SENTENCE IN COUNT I. COUNT III: CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH AFFIRMED. EXECUTION DATE TO BE SET WITHIN SIXTY DAYS OF FINAL DISPOSITION OF THIS CASE PURSUANT TO MISS. CODE ANN. § 99-19-105(7)(1996) AND M.R.A.P. 41(a).**

**LEE, C.J., PRATHER AND SULLIVAN, P.JJ., PITTMAN, BANKS, ROBERTS, SMITH AND MILLS, JJ., CONCUR.**

## APPENDIX

## DEATH CASES AFFIRMED BY THIS COURT

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Jackson v. State*, 672 So. 2d 468 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581(Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

***Shell v. State***, 554 So. 2d 887 (Miss. 1989), ***Shell v. Mississippi,*** 498 U.S. 1 (1990) reversing, in part, and remanding, ***Shell v. State***, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d 165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

***Pinkney v. State***, 538 So. 2d 329 (Miss. 1989), ***Pinkney v. Mississippi***, 494 U.S. 1075 (1990) vacating and remanding ***Pinkney v. State***, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

***Clemons v. State***, 535 So. 2d 1354 (Miss. 1988), ***Clemons v. Mississippi***, 494 U.S. 738 (1990) vacating and remanding, ***Clemons v. State***, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).


## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

***Jones v. State***, 517 So. 2d 1295 (Miss. 1987)***, Jones v. Mississippi***, 487 U.S. 1230 (1988) vacating and remanding, ***Jones v. State***, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So. 2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).


**DEATH CASES AFFIRMED BY THIS COURT**

**(continued)**

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 61 (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

## DEATH CASES REVERSED AS TO GUILT PHASE

## <u>AND SENTENCE PHASE</u>

*Giles v. State*, 650 So. 2d 846 (Miss. 1995)

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994)

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994)

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*, 531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 1291 (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).


## DEATH CASES REVERSED AS TO GUILT PHASE

### AND SENTENCE PHASE

### (continued)

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).


## DEATH CASES REVERSED

### AS TO PUNISHMENT AND REMANDED

### FOR RESENTENCING TO LIFE IMPRISONMENT

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. 1983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

## DEATH CASES REVERSED AS TO

## PUNISHMENT AND REMANDED FOR A NEW TRIAL

## <u>ON SENTENCING PHASE ONLY</u>

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

**Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State* 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) vacating and remanding, *Pinkney v. State,* 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

**Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

**Jones v. State*, 517 So. 2d 1295 (Miss. 1987), *Jones v. Mississippi,* 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989).

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

## DEATH CASES REVERSED AS TO

## PUNISHMENT AND REMANDED FOR A NEW TRIAL

## <u>ON SENTENCING PHASE ONLY</u>

### <u>(continued)</u>

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984).

* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing

1. There was evidence that Brown had been lusting after young Evangela Boyd. Laura Jones, Chick Jones' mother and a friend who fixed the Boyd womens' hair, testified that one day in 1992 or 1993, when Evangela was at her house, she had overheard Brown say, "I'm going to get some of that." She further stated:

> Well, I didn't say anything to him at first, you know, because he was -- everybody was still outside. But when I came inside, then later on he came in the house and asked for some water, and I told him that I heard him, and I told him he should be ashamed of his self, and he just smiled, you know, and he, That was just ripe. I told him she was just a young child, I said, That's a young child. And he said that she was just ripe, ripe like a peach.

2. Although a warrant had been issued for Brown's arrest in DeSoto County, Mississippi, Memphis police officers did not have either an arrest warrant or a search warrant in hand at the time of his arrest.

3. That portion of the instruction is taken from the Fifth Circuit's decision in *Spinkellink v. Wainwright*, 578 F.2d 582, 611 (5th Cir. 1978), *cert. denied*, 440 U.S. 976, 99 S. Ct. 1548, 59 L. Ed. 2d 11 (1990). *See also Jenkins v. State*, 607 So. 2d 1171, 1181 (Miss. 1992).